Filed 1/8/25  P. v. Twinn CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES RONELL TWINN,<br><br>Defendant and Appellant. | F086482<br><br>(Super. Ct. No. F22908150)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On March 17, 2023, defendant James Ronell Twinn was convicted of, among other things, forcible rape of M.A. and false imprisonment of B.C. by violence or menace. On appeal, defendant argues that (1) there is insufficient evidence to support the conviction for forcible rape of M.A., (2) there is insufficient evidence to support the conviction for false imprisonment of B.C. by violence or menace, and (3) the trial court erred by failing to instruct the jury on misdemeanor false imprisonment, a lesser included offense of false imprisonment by violence or menace. The People disagree. We affirm.

### PROCEDURAL HISTORY

On February 21, 2023, the District Attorney of Fresno County filed a first amended information charging defendant with forcible rape of M.A. (Pen. Code,[1] § 261, subd. (a)(2); counts 1, 2); kidnapping M.A. to commit rape (§ 209, subd. (b)(1); count 3); false imprisonment of M.A. by violence or menace (§ 236; count 4); assaulting M.A. with a deadly weapon (§ 245, subd. (a)(1); count 5); making criminal threats to M.A. (§ 422; count 6); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 7); possession of ammunition by a person prohibited from owning a firearm (§ 30305, subd (a)(1); count 8); forcible rape of B.C. (§ 261, subd. (a)(2); counts 9, 10); forcible oral copulation of B.C. (§ 287, subd. (c)(2)(A); counts 11, 12); kidnapping B.C. to commit rape (§ 209, subd. (b)(1); count 13); and false imprisonment of B.C. by violence or menace (§ 236; count 14). The first amended information alleged enhancements and aggravating factors, including that, as to count 2, defendant used a deadly weapon (a knife) during commission of a sex offense (§ 12022.3, subd. (a)).

On February 23, 2023, defendant pled no contest to counts 7 and 8. After the prosecution's case-in-chief, defendant made a motion for acquittal on all counts pursuant to section 1118.1. The trial court granted the motion as to count 13, but otherwise denied it.

---

[1] Undesignated statutory references are to the Penal Code.

On March 17, 2023, defendant was found guilty by a jury on counts 2, 9, 10, 11, 12, and 14.  The jury did not reach a unanimous verdict on counts 1, 3, 4, 5, and 6, or the use of a deadly weapon enhancement attached to count 2.[2]

On June 5, 2023, the trial court sentenced defendant to an aggregate term of 30 years to life, plus two years, consisting of:  15 years to life on count 2; 15 years to life on count 9; and two years (the middle term) on count 7.  The court also imposed the following concurrent terms:  two years (the middle term) on counts 8 and 14; and 15 years to life on counts 10, 11, and 12.

Defendant timely filed a notice of appeal.

## FACTUAL SUMMARY

**The Prosecution's Case**

*The 2021 Incident*

On April 6, 2021, B.C., who was 17 years old, walked to a store.  While she was walking, defendant drove up to her and asked her if she needed anything.  B.C. told defendant that she needed a cigar wrap, and defendant got it for her.  Defendant also told her that he could get marijuana, and B.C. gave defendant her phone number.

Later that day, defendant and B.C. had a conversation via text message.  Defendant told B.C. that he had marijuana.  At approximately 11:00 p.m., B.C. snuck out of her house and got into defendant's car.  Eventually, they went to a casino.  Before going into the casino, B.C. smoked marijuana.

After B.C. gambled for a while, defendant asked B.C. if she wanted to see the city lights, and B.C. said yes.  They got into defendant's car, and defendant started driving.  As defendant continued to drive, B.C. began getting more and more nervous because it kept getting darker and she had just met defendant.  However, after defendant parked in an area near other cars, she "didn't feel so nervous anymore."

---

[2]     All hung counts were later dismissed at the prosecution's request.

While they were parked, B.C. voluntarily drank a shot of alcohol. Defendant encouraged B.C. to drink more and told her, " 'We'll start driving back that way the more we finish the bottle.' " So, B.C. "faked" taking additional shots, although defendant noticed.

After approximately 20 minutes, B.C. said that she needed to use the restroom, and defendant started driving back. Eventually, defendant pulled over on a dirt shoulder and parked on top of a little dirt hill. It was dark, and no other cars were parked in the area. B.C. told defendant to take her home because she needed to use the restroom. Defendant told B.C. that they would leave after she took another shot, so she "faked" taking the shot. Defendant also told B.C. that if she needed to use the restroom so badly, "to just pop a squat."

B.C. again asked defendant to take her home, and she waited a bit to see if he would start driving. He did not start driving, so she got out of the car and peed.

B.C. got back into the car. After approximately a minute, defendant got out of the car and went to the passenger side door. Defendant tried to pull B.C.'s pants down, but she kept pulling them back up and begging him not to do it. Defendant told B.C. to be quiet. He got on top of B.C. and continued pulling on her pants. B.C. tried to resist by wiggling her body and closing her legs, but defendant was too heavy and too strong. B.C.'s legs were shaking because she was scared.

Defendant inserted his penis into B.C.'s vagina and "kept going in and out." Defendant eventually opened B.C.'s legs and orally copulated her. After that, he inserted his penis into her vagina again and "kept going in and out" while holding B.C. down. After that, he orally copulated B.C. again and then inserted his penis into her vagina again. Defendant also bit B.C., sucked on her body, and slapped her cheek.

After defendant inserted his penis into B.C.'s vagina the third time, B.C. saw her phone next to her, slipped her hand out, and called 911. B.C. did not say anything

4.

because she was afraid that defendant would kill her. However, she put the phone close to her face and made "[gasping] sounds and weird noises" so the operator would know that she was in danger.

Eventually, Fresno County Sheriff's Office deputies arrived, and defendant stopped. B.C. got out of the car and told a deputy that she had been raped.

*The 2022 Incident*

On August 13, 2022, M.A. went on a walk to exercise because she recently got out of the hospital. She stopped at a park because she could not catch her breath. While she was at the park, defendant approached her and said, " 'Hi, I haven't seen you since [*sic*] a long time.' " However, M.A. did not know who he was. Defendant offered her a ride, but she declined. Defendant told her to get into his car. As defendant said this, he was holding something in his pocket. M.A. eventually agreed to go with defendant because she was afraid, and defendant escorted her to his car.

As defendant was driving, M.A. repeatedly asked defendant to let her get out, but defendant did not let her out.

Defendant stopped at a liquor store and went inside to buy alcohol. M.A. tried to get out of the car, but the door would not open. M.A. looked around the car, and she saw the handle of a gun underneath her seat. However, she was unable to reach it.

After defendant got back into the car, he pulled out a knife. He told M.A. that if she yelled, he would "take [her] out." Defendant also opened the bottle of alcohol he bought and told M.A. to drink from it. M.A. did not want to drink, but she drank every time defendant told her to. At first, she only pretended to drink, but defendant noticed.

Defendant drove to a different park and parked. M.A. did not see any other cars or people around. Defendant got out of the car and went to the passenger side. He reclined M.A.'s seat and moved her legs so that he would fit on top of her. M.A. started crying,

5.

told defendant to stop, and tried to defend herself. Defendant told her to pull down her shorts. She crossed her legs and tried to push defendant off.

M.A. started screaming. Defendant put the knife to the left side of her neck and told her that he would kill her if she yelled. He also pulled off her shorts. M.A. tried to pull her shorts back up, but defendant stopped her.

After defendant put on a condom and pulled M.A.'s shorts off, he penetrated her vagina with his penis. Defendant "thrust[ed] back and forth." Defendant also told M.A. to hug him, to tell him that she wanted to have a child with him, and to tell him that she loved him.

Eventually, the condom tore. Defendant took it off and threw it out of the car. He then penetrated M.A. again, and he continued thrusting until he ejaculated. After defendant ejaculated, he started picking up his pants. M.A. noticed that defendant had dropped the knife, and she picked it up because she was afraid defendant was going to kill her.

After defendant got off M.A. and out of the car, M.A. got out of the car. She yelled for help and tried to run as fast as she could. She saw a man in the distance stand up. M.A. ran towards the man, and defendant left. M.A. gave her cell phone to the man and asked him to call 911, which he did.

M.A. was transported to a hospital, where she was examined by a sexual assault forensic examiner nurse. The nurse observed that M.A. had "a little pinprick" on the left side of her neck, which M.A. told the nurse came from defendant putting a knife to her throat. Additionally, there was redness on M.A.'s right wrist, which M.A. told the nurse came from defendant grabbing her and holding her down. The nurse also examined M.A.'s vagina. M.A. "had some blood and discharge on the outside of the vagina, with a small laceration to the opening of the vagina. And then, inside, there was also more blood and discharge."

6.

**Defendant's Case**

Defendant testified on his own behalf. According to defendant, both encounters were consensual.

*The 2021 Incident*

As to the 2021 incident, defendant was driving and made eye contact with B.C. She put her hands up in a greeting, so defendant stopped his car next to her. They talked, and defendant asked B.C. her age. B.C. first told defendant she was 21 years old, then told him she was 19 years old. During the conversation, B.C. gave defendant her phone number.

Defendant and B.C. exchanged text messages about setting up a time to meet. They also discussed having marijuana for B.C., and B.C. told defendant the brand of alcohol she drinks.

Later that day, defendant picked B.C. up and they eventually went to a casino. Prior to going into the casino, defendant and B.C. drank alcohol. Additionally, B.C. smoked marijuana. At the casino, they gambled using defendant's money.

After about two hours, they decided to leave the casino. B.C. asked if there was somewhere they could go to smoke and finish the bottle of alcohol. Defendant told her there was, and he drove them to a place he called "city lights." They talked, and B.C. eventually reached over and gave defendant a kiss. They kissed for about 10 minutes, then B.C. asked if they could go somewhere more private. Defendant drove them to a different location, where they engaged in consensual sexual intercourse.

Eventually, a sheriff's deputy arrived. After the deputy arrived, defendant noticed that B.C. had been sitting on her phone. After the deputy got out of his car, defendant noticed that B.C. was attempting to hide from the deputy. The deputy walked closer and asked if everything was all right. B.C. then stood up and told the deputy that she had been raped.

7.

*The 2022 Incident*

As to the 2022 incident, defendant drove to a park to meet a friend. Defendant parked, and M.A. approached him. She asked him to buy her a drink, and he said that he would. Before getting into his car, she asked him if he "date[d],"[3] and he said, "[Y]es."

Defendant drove M.A to a liquor store, went inside, and bought an alcoholic beverage for them to share. After that, they went to a different park, drinking on the way.

After arriving, M.A. agreed to have sexual intercourse with defendant in exchange for crystal meth and $20. He put on a condom, and they had consensual sexual intercourse in the car.

After defendant finished, he pulled money from his pocket to pay M.A. When she saw the amount of money he had, she repeatedly asked him to give her more money. He refused. Before he left, she told him that he would regret it.

When defendant was interviewed by detectives regarding this incident, they showed him a picture of a knife, and he did not recognize it. However, he later remembered that a friend had left that knife in his car. When defendant had found it, he put it in the middle console of his car and never touched it again.

Defendant also introduced a video of a detective testing the lock on the front passenger side door of the car. When the car was locked, the door did not open when the door handle was pulled. However, the detective was able to unlock the car from the passenger seat, and when he did, the door opened when the door handle was pulled.

## DISCUSSION

### I. Substantial Evidence Supports the Convictions

Defendant argues that the convictions on counts 2 (forcible rape of M.A.) and 14 (false imprisonment of B.C. by violence or menace) are not supported by substantial evidence. The People disagree, as do we.

---

[3] According to defendant, "dating" means paying for sexual intercourse.

### A. *Applicable Law*

"Forcible rape is defined as 'an act of sexual intercourse … with a person not the spouse of the perpetrator … accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' " (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022.) "[I]t has long been recognized that 'in order to establish force …, the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' " (*Id.* at pp. 1023–1024, first bracketed insertion added.) " ' " '*The kind of physical force is immaterial; ...* it may consist in the taking of indecent liberties with a woman, or laying hold of and kissing her against her will.' " ' " (*Id.* at p. 1024.)

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) "In this context, ' "[p]ersonal liberty" ' is violated when 'the victim is "compelled to remain where [s]he does not wish to remain, or to go where [s]he does not wish to go." ' [Citations.] It is the restraint of a person's *freedom of movement* that is at the heart of the offense of false imprisonment …." (*People v. Reed* (2000) 78 Cal.App.4th 274, 280, first bracketed insertion in original.) " ' " 'The wrong may be committed by acts or by words, or both, and by merely operating upon the will of the individual or by personal violence, or both ....' " ' " (*Ibid.*) "The offense becomes felonious when it is 'effected by violence, menace, fraud, or deceit ....' [Citations.] ' "Violence" ... means the " 'the exercise of physical force used to restrain over and above the force reasonably necessary to effect such restraint.' " ' [Citation.] 'Menace' is defined as ' " 'a threat of harm express or implied by word or act.' " ' " (*Ibid.*)

### B. *Standard of Review*

When evaluating a sufficiency of evidence claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial

evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "The test for evaluating a sufficiency of evidence claim is deferential." (*People v. Flores* (2020) 9 Cal.5th 371, 411.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Flores*, at p. 411.) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*Cravens*, at p. 508.)

### C. Analysis re: Count 2, Forcible Rape of M.A.

Defendant argues that "under the facts of this case and especially in light of the failure of the prosecution to prove *any* of the other charges and enhancements which all deal with factors of either force, threat, duress or menace, [defendant] submits that in the [M.A.] case the conviction [on count 2] for forcible rape lacks substantial evidence and must be reversed."[4]

Defendant's argument lacks merit. He largely relies on the fact that the jury did not reach a verdict on the other counts related to the 2021 incident or the knife enhancement attached to count 2. According to defendant, as the jury did not reach a verdict on the knife enhancement, the knife could not have been the basis of the finding of force. Additionally, "because the jury hung on all the other counts and enhancements including kidnapping to commit rape, false imprisonment by violence, assault with a deadly weapon or criminal threats (Count 3 to 6), the elements of force, duress or menace inherent in those charges cannot support a finding of force in Count 2." However, the

---

[4]     The first amended information alleged two counts of forcible rape of M.A. Count 1 was based on the first act of intercourse and count 2 was based on the last act of intercourse. The jury did not reach a unanimous verdict on count 1.

jury's failure to reach a verdict on the other counts is not relevant to the issue of whether substantial evidence supports the conviction on count 2.

Generally, if a conviction is supported by substantial evidence, it is allowed to stand even if it is inconsistent with other verdicts. (See § 954 ["An acquittal of one or more counts shall not be deemed an acquittal of any other count."]; *People v. Avila* (2006) 38 Cal.4th 491, 600 ["As a general rule, inherently inconsistent verdicts are allowed to stand."]; *People v. Lewis* (2001) 25 Cal.4th 610, 656 [" '[A] criminal defendant … is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts' "].) "For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] Although ' "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted." (*Avila*, at p. 600.)

Accordingly, we need not attempt to reconcile the allegedly inconsistent verdicts. (*People v. Carbajal* (2013) 56 Cal.4th 521, 532 [" '[A]n individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.' "].) Instead, the question before us is whether substantial evidence supports the conviction on count 2. And here, it does.

To begin, there is substantial evidence that defendant used a knife to accomplish the sexual intercourse. M.A. testified that, before defendant pulled off her shorts and penetrated her, she screamed. Defendant responded by putting a knife to her neck and telling her that he would kill her if she yelled. Additionally, there is evidence that she picked up the knife after defendant dropped it and later gave it to a police officer. There is also evidence that the knife was tested for DNA, and "the DNA results provided very strong support that [defendant] [was] a contributor to the DNA mixtures that were … obtained from the knife swab." Finally, M.A. was examined by a nurse, and the nurse observed that M.A. had "a little pinprick" on the side of her neck, which M.A. told the nurse came from defendant putting a knife to her throat.

Moreover, even if we did not consider evidence related to the knife, there is still substantial evidence that defendant used force. According to M.A., while she was in the passenger seat of the car, defendant reclined her seat and moved her legs so he would fit on top of her. M.A. told defendant to stop, crossed her legs, and tried to push defendant off. However, defendant eventually got her shorts off and penetrated her. She attempted to pull her shorts back up, but defendant prevented it. After defendant took the condom off, he penetrated her again. Defendant, who was approximately six feet two inches tall and weighed more than 250 pounds, was still on top of her, and she could not get out of the car. This is substantial evidence that defendant used force to accomplish the sexual assault. (See, e.g., *People v. Griffin, supra*, 33 Cal.4th at pp. 1025, 1029 [holding that " ' "force" plays merely a supporting evidentiary role, as necessary only to insure an act of intercourse has been undertaken against a victim's will,' " and finding sufficient force where the defendant "pinned [the victim's] arms to the floor as he penetrated her vagina with his penis"].)

Therefore, defendant's argument that the conviction on count 2 lacks substantial evidence fails.

### D. *Analysis re: Count 14, False Imprisonment of B.C. by Violence or Menace*

Defendant also argues that the prosecution failed to present sufficient evidence to support the conviction on count 14 for false imprisonment by violence or menace. According to defendant, he "did not commit 'violence' within the definition of the statute" because "his use of force in 'pinning' down" B.C. "was at the same time an act committed in furtherance of the sexual offenses and necessarily committing the false imprisonment." Defendant also argues that "no additional threat or menace was employed by either physical harm or by intimidating conduct."

Defendant's argument is not persuasive. Even assuming defendant is correct that there is no evidence of violence because pinning B.C. down is the act that prevented B.C. from moving, there is substantial evidence of menace.[5]

Both B.C. and a sheriff's deputy testified that defendant and B.C. were parked in a secluded location. At the time, defendant weighed approximately 200 pounds and was approximately six feet two inches tall. B.C. weighed approximately 130 pounds and was approximately five feet five inches tall. According to B.C., while at the secluded location, defendant tried to pull her pants down, but she resisted and begged him not to do it. Eventually, defendant pulled her pants off and got on top of her. B.C. tried to resist by wiggling her body and closing her legs, but defendant was too heavy and too strong. Defendant then penetrated her, orally copulated her, penetrated her again, orally copulated her again, and then penetrated her again. During the sexual assaults, defendant slapped B.C. while telling her to " 'shut up,' " sucked on her, and bit her.

---

[5] In *People v. Matian* (1995) 35 Cal.App.4th 480, the court held that either a weapon or a verbal threat of harm is required for a finding of menace. (*Id.* at pp. 485–486.) While defendant mentions this case, defendant does not urge us to adopt this holding. Moreover, like our court in *People v. Aispuro* (2007) 157 Cal.App.4th 1509, 1513, we disagree with this holding. (See also *People v. Islas* (2012) 210 Cal.App.4th 116, 125–126; *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1490–1491.)

The penetration, oral copulation, slapping, biting, and sucking were not acts necessary to restrain B.C. Moreover, from these acts, the jury could reasonably conclude that defendant showed he was willing to harm B.C. if she did not remain in the passenger seat while he continued to sexually assault her. (See *People v. Aispuro, supra*, 157 Cal.App.4th at p. 1513 ["Threats can be exhibited in a myriad number of ways, verbally and by conduct."].)

Additionally, there is evidence that B.C. and defendant were in a secluded location and that defendant was much larger than B.C. B.C. also testified that she "was scared that if [she] did anything wrong, [defendant] would have killed [her]." This is further evidence that defendant impliedly threatened to harm her. (See *People v. Whitmore* (2022) 80 Cal.App.5th 116, 130 ["A jury properly may consider a victim's fear in determining whether the defendant expressly or impliedly threatened harm."].)

Finally, there is evidence that defendant was not on top of B.C. during the entire incident. Despite this, and despite evidence that B.C. did not want to be there, B.C. remained in the passenger seat until after a deputy arrived.

There is thus substantial evidence from which a jury could conclude that B.C. was compelled to remain in the passenger seat by an implied threat of harm.

Defendant's arguments to the contrary are unpersuasive. While conceding that "it is uncontroversial" that sexual assaults can contribute "to the force or fear necessary to commit … later false imprisonment," defendant argues that this is not what occurred here. However, defendant ignores that there is evidence of five separate acts of sexual assault that occurred over a period lasting longer than 20 minutes, as well as evidence that B.C. remained in the passenger seat during and after each assault. Thus, there is evidence in this case that acts of sexual assault contributed to the fear necessary to commit false imprisonment.

14.

Defendant also appears to argue that we cannot consider the facts underlying the sexual assault as the basis for the false imprisonment conviction because "the physical restraint against [B.C.] was at the same time an act committed in furtherance of the sexual offenses." However, defendant cites no law in support of this argument, and our court has held the opposite.[6] (See *People v. Reed, supra*, 78 Cal.App.4th at pp. 281–282; *People v. Islas, supra*, 210 Cal.App.4th at pp. 124–126, 129–130.)

Based on the foregoing, defendant's argument that the conviction on count 14 lacks substantial evidence fails.

## II. Any Error in Failing to Provide the Jury Instruction for Misdemeanor False Imprisonment Was Harmless

### A. Applicable Law

"All elements of misdemeanor false imprisonment are also elements of the felony; the felony cannot be committed without necessarily committing the misdemeanor. The misdemeanor is therefore a lesser included offense of the felony." (*People v. Babich* (1993) 14 Cal.App.4th 801, 807.)

"The [trial] court must instruct on any lesser included offense for which there is substantial evidence to support a conviction [citation], but not if the pertinent evidence is 'minimal and insubstantial' [citation]. ' "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." ' " (*People v. Hicks* (2017) 17 Cal.App.5th 496, 507; see also *People v. Najera* (2008) 43 Cal.4th 1132, 1136 [" 'in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence' "].)

---

[6] Defendant does not argue that he could not be convicted of both the sexual offenses and false imprisonment because they are based on the same acts, or that the trial court erred by failing to stay the conviction on count 14 pursuant to section 654.

## B. Standard of Review

"We review the trial court's failure to instruct on a lesser included offense de novo [citations] considering the evidence in the light most favorable to the defendant [citations]." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.) "When substantial evidence supports an instruction on a lesser included offense, the failure to so instruct is assessed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 …." (*People v. Hicks, supra*, 17 Cal.App.5th at p. 507; see also *People v. Gonzalez* (2018) 5 Cal.5th 186, 195–196.) Under this standard, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson*, at p. 836.)

## C. Analysis

Defendant argues that the trial court erred because it did not sua sponte instruct the jury on misdemeanor false imprisonment, a lesser included offense of felony false imprisonment.

Even assuming defendant is correct that the trial court erred, we will only reverse the judgment if the error was prejudicial. However, defendant does not argue, in either his opening brief or his reply brief, that the error was prejudicial. Defendant's only argument that might be related to prejudice is that substantial evidence does not support the conviction for felony false imprisonment, but, as discussed *ante*, this argument fails.

Moreover, we have reviewed the record, and we see no prejudice. Notably, defendant and B.C. told two conflicting versions of events regarding what occurred after they left "city lights." According to defendant, the sexual encounter was consensual and he never restrained B.C. According to B.C., she was repeatedly sexually assaulted by a large man in a secluded location while forced to remain in the passenger seat. As defendant was convicted on all counts submitted to the jury regarding B.C., it appears the

16.

jury believed B.C.'s account. And as discussed above, B.C.'s account included substantial evidence of menace.

Accordingly, there is no reasonable probability that the jury would have convicted defendant of misdemeanor false imprisonment instead of felony false imprisonment had they been instructed on both, and defendant's argument fails.

## DISPOSITION

The judgment is affirmed.


HILL, P. J.

WE CONCUR:


DETJEN, J.


MEEHAN, J.